*Mayra A. Mondragon v. The Kroger Co., and Bar-S Foods Co.*
*USDC, Northern District, Atlanta Division*
*Civil Action File Number: 1:19-CV-04690-JPB*

# EXHIBIT A:

## SEPTEMBER 5, 2019 TENDER AND REQUEST FOR COVERAGE

# GRAY, RUST, ST. AMAND, MOFFETT & BRIESKE, L.L.P.
## ATTORNEYS AT LAW

950 EAST PACES FERRY ROAD, N.E.
SUITE 1700 – SALESFORCE TOWER ATLANTA
ATLANTA, GEORGIA 30326
(404) 870-7386 (Telephone)
(404) 870-1033 (Facsimile)
slisle@grsmb.com (E-mail)

September 5, 2019

**Via Certified Mail, Return Receipt Requested**
**And Via First-Class U.S. Mail**

Thomas J. Mazziotti
Hall Booth Smith, P.C.
191 Peachtree street, N.E.
Suite 2900
Atlanta, Georgia 30303

**In Re:**  *Mayra Mondragon, on her own and on behalf of her minor child D.G. v. Bar-S Foods, and The Kroger Co.*
Superior Court of Gwinnett County; Civil Action File No. 19-A-06621-10
Date of Incident: 3/2/19
Loss Location: 4920 Roswell Road, Atlanta, Georgia

## <u>TENDER AND REQUEST FOR COVERAGE – IMMEDIATE ATTENTION REQUIRED</u>

Dear Mr.Mazziotti:

The undersigned and this law firm represent the interests of The Kroger Co. (hereinafter, "Kroger"). *Please notify us of your receipt and acceptance of this letter on behalf of Bar-S Foods. If we must send a separate copy to Bar-S Foods, please notify us immediately.*

As you are aware,  on July 3, 2019, a complaint was filed by Mayra Mondragon, on her own behalf and on behalf of her minor child, D.G. against Bar-S Foods Co., Inc and The Kroger Co.,  in the Superior Court, State of Georgia, Civil Action File Number 19-A-06621-10.Enclosed with this correspondence is a copy of such complaint setting forth the claim for damages, the cause, the circumstances, and the date of the alleged accident and injuries and damages sustained by the plaintiff in this case.

According to the Complaint, on March 2, 2019, Ms. Valades "purchased a package of Bar-S Franks hotdogs" from the Kroger store on Roswell Road, and when she prepared the hot dogs 3 days later, her child refused to eat the hot dogs and she "noticed something whiteish in color that resembled a worm", (Compl. ¶¶ 7,10,12).  Plaintiff further asserts that "the worm-like object might be a maggot". (See Compl. ¶ 12). Ms. Mondragon asserts claims including negligence per se, strict liability, and breach of warranty of merchantability.

On or about February 28, 2019, Bar-S Foods, a Sigma Company ("Bar-S"), entered into a Vendor Agreement ("Agreement") with The Kroger Co. ("Kroger") in which Bar-S agreed to **defend, indemnify and hold Kroger harmless from and against all suits, proceedings at law or in equity against claims asserted against Kroger or incurred by Kroger, arising out of or in connection with the Products.** A true and correct copy of the Agreement is attached hereto as Exhibit B.

Under the terms of the Agreement, Bar-S Foods warrants and guarantees that its products are of merchantable quality, are free from contamination or impurity, and are fit and sufficient for purposes in which goods of that type are ordinarily used. In this instance, the products are hot dogs, which under the Agreement, Bar-S Foods guarantees are fit for consumption. The Agreement also requires Bar-S Foods to indemnify and hold Kroger harmless from all claims, suits and expenses, including attorney's fees, arising out of Bar-S Foods actual or alleged breach of any of the representations, warranties, guarantees or other terms and conditions contained herein.

The relevant portions of the Agreement state as follows:

2.   <u>Representations, Warranties and Guarantees.</u>

l.   The Products are of merchantable quality and of good material and workmanship, are free from contamination or impurity and defects in design and title, and are fit and sufficient for purposes for which goods of that type are ordinarily used, as well as any purpose Vendor has specified or advertised.

5.   <u>Indemnification.</u>

a.   Vendor will defend, indemnify and hold Kroger, its affiliates and its and their officers, directors and employees, harmless from and against all suits, proceedings at law or in equity, claims, liabilities, costs, payments and expenses (including attorneys' fees) asserted against Kroger or incurred by Kroger, arising out of or in connection with 1) the Products, including Kroger's purchase, use, shipment, storage, delivery, sale, offering for sale, or other handling of the Products, 2) Vendor's actual or alleged breach of any of the representations, warranties, guarantees or other terms and conditions contained herein, or 3) any claim for damages to property or injuries to persons or fines or penalties incurred as a result of or caused by the acts or omissions of Vendor's employees or agents.

6.   <u>Insurance Requirements.</u> Vendor will maintain at all times while providing Products to Kroger, at Vendor own cost and expense, insurance coverage of the types and in such amounts as described in Exhibit A with a company that has an A.M. Best Co. rating of "A-" or better. The insurance coverage required under this Agreement must be Occurrence coverage and maintained by each Vendor for a minimum period of five (5) years following any purchase by Kroger or as long as the Products are still held by Kroger for resale or use, whichever is longer. Vendor will deliver to Kroger, prior to shipping Products, a Certificate of Insurance including "The Kroger Co. and its subsidiaries, affiliates, director, officers, agents and employees under the Vendor Additional Insured coverage."

If Kroger is held liable in this Lawsuit, such liability will be predicated solely on the Bar-S Food's failure to provide a product free from impurities or contamination. The express terms of the Agreement require Bar-S Foods to indemnify Kroger and hold Kroger harmless from all claims, losses, damages, and

expenses, including attorney's fees.  Furthermore, the Agreement requires Kroger to be a named additional insured by Bar-S Foods insurance policy and afforded coverage thereunder.

*Please notify us of your receipt and acceptance of this letter on behalf of Bar-S Foods. If we must send a separate copy to Bar-S Foods, please notify us immediately.*  Otherwise, we will understand that you can accept this letter and will proceed accordingly.  As such, having duly notified Bar-S Foods of Maya Mondragon's claims and Lawsuit, Kroger hereby provides Bar-S Foods the opportunity to fully indemnify Kroger and hold Kroger harmless from all losses, damages, and expenses, including attorney's fees, incurred by Kroger in relation to Mondragon's Lawsuit.

If, **within ten (10) calendar days of the date of this correspondence**, the undersigned has not received Bar-S Foods unconditional acceptance of Kroger's tender of defense and indemnity in writing and/or an unconditional acceptance of Kroger's tender, by Bar-S Foods liability insurance carrier, we may take further action, on behalf of Kroger, to formally assert all available claims against Bar-S Foods and/or its liability insurance carrier.  Kroger requests Bar-S Foods to promptly forward a copy of this correspondence, along with all exhibits and attachments hereto, to its liability insurance carrier.  Kroger further requests, pursuant to O.C.G.A. § 33-3-28(a)(2), that Bar-S Foods send the undersigned the names of each and every insurer (including policy number, named insureds and additional insureds, and the limits of each policy's coverage) that issued a general liability policy to the Landlord in relation to the Shopping Center.

If you have any questions, please contact me directly at your earliest opportunity.  Thank you in advance for your prompt attention to this matter.

Sincerely,

Sarah Raquel L. Lisle, Esq.

Enclosures:     Plaintiff's Complaint and Demand for Jury Trial
                Standard Vendor Agreement dated February 28, 2019

E-FILED IN OFFICE - SC
CLERK OF SUPERIOR COURT
GWINNETT COUNTY, GEORGIA
**19-A-06621-10**
**7/3/2019 12:31 PM**



CLERK OF SUPERIOR COURT

## IN THE SUPERIOR COURT OF GWINNETT COUNTY
## STATE OF GEORGIA

| | |
|---|---|
| **MAYRA A. MONDRAGON,**<br>**on her own behalf and on behalf of**<br>**her minor child, D.G.,** | )<br>)<br>)<br>) |
| **Plaintiffs,** | )<br>)   **CIVIL ACTION**<br>)   **FILE NO.** |
| **v.** | )<br>) |
| **BAR-S FOODS CO., INC.,**<br>**THE KROGER CO., INC.**<br>**Defendants.** | )   **19-A-06621-10**<br>)<br>)<br>) |

### COMPLAINT FOR DAMAGES

COMES NOW Mayra A. Mondragon, on her own behalf and on behalf of her minor child, D.G., by and through the undersigned counsel, and brings this action against Defendants and states as follows:

### PARTIES

1.   Plaintiff, MAYRA A. MONDRAGON (hereinafter "Ms. MONDRAGON,,) is a resident of the State of Georgia.

2.   Plaintiff D.G. (hereinafter "D.G.,,) is a three year old minor child and is a resident of the State of Georgia. His mother, Ms. Mondragon, sues on his behalf, as well as on her own behalf, for the medical expenses incurred for D.G.'s treatment and recovery, and for D.G.'s pain and suffering.

3.   Defendant, Bar-S Foods Co., Inc. ("Bar-S Foods,,) is a foreign corporate entity that sells meat products throughout the State of Georgia and notice of this action may be properly served upon its registered agent, Capitol Corporate Services, Inc., located at 3675 Crestwood Parkway, N.W., Suite 350, Duluth, GA 30096.

4.   Defendant The Kroger Co, Inc. ("Kroger,,), is a foreign corporate entity with grocery stores throughout the State of Georgia and notice of this action may be properly served

1

upon its registered agent, CSC of Cobb County, Inc., located at 192 Anderson Street SE, Suite 125, Marietta, GA 30060.

## JURISDICTION AND VENUE

5.   The Court has jurisdiction over this claim against all Defendants because the torts and other acts complained of herein occurred in the State of Georgia and all Defendants transact business in the State of Georgia.

6.   Venue is proper before this Court pursuant to O.C.G.A. § 14-2-510 (b) (1) because Defendant Bar-S Foods maintain a registered office in Gwinnett County, Georgia.

## RELEVANT FACTS

7.   On March 2, 2019, Ms. Mondragon purchased a package of Bar-S Franks hotdogs along with other grocery items from Kroger located at 4920 Roswell Road, Atlanta, Fulton County, Georgia.

8.   At the time of her purchase, Ms. Mondragon did not notice anything unusual about either the Bar-S Franks packaging or the hotdogs inside.  The package was not leaking and did not appear to be open.

9.   After her purchase, Ms. Mondragon immediately returned to her home and put away the groceries including placing the hotdogs in her refrigerator.

10.   Approximately three (3) days after purchasing the hotdogs on March 5, 2019, Ms. Mondragon opened the package and prepared two of the hotdogs for herself and her three year old son.  Ms. Mondragon prepared the hotdogs by pan searing them on top of the stove and cutting them into smaller pieces.

11.   After preparing the hotdogs, Ms. Mondragon placed them on a plate and began feeding them to her three year old son.  When Ms. Mondragon initially placed the hotdogs on the plates, there was nothing unusual.

2

12.   After eating two (2) to three (3) pieces of the hotdog, DG spit out the next bite and took the partially eaten portion from his mouth. After DG refused to take another bite, Ms. Mondragon began closely looking at the hotdog and noticed something whitish in color that resembled a worm. She called DG's father (Mr. Greene) who took a photo and zoomed in on whitish worm-like object. They suspected that the worm-like object might be a maggot based on photographs from the internet.

13.   DG began experiencing a stomach ache shortly after the discovery. Later in the evening, he begin having diarrhea. Ms. Mondragon also began experiencing a stomach ache and nausea.

14.   The next morning, March 6, 2019, Ms. Mondragon and Mr. Greene took DG to his pediatrician. The pediatrician's assessments included infectious gastroenteritis and colitis, bacterial foodborne intoxication, and acute abdomen.

15.   After the discovery on March 5, 2019, Ms. Mondragon contacted Bar S Foods to advise them of the worm-like objects in the hotdogs. Bar S directed Ms. Mondragon to preserve both the cooked and uncooked hotdogs in separate ziplock bags. She did so.

16.   On March 7, 2019, Bar S Foods sent a representative out to pick up the hotdogs for testing. The Bar S Foods representative signed a receipt upon taking the hotdogs.

17.   After testing the hotdogs, Bar S Foods' Insurance Company, Gallagher and Bassett spoke with Ms. Mondragon and Mr. Greene confirming that the worm-like object in their son's hotdog had indeed been a maggot.

18.   Bar S Foods' Insurance Company, Gallagher and Bassett went on the say that it was likely Kroger's fault and not that of their insured.

19.   Bar S Foods' representative offered the Ms. Mondragon and Mr. Greene a gift certificate for their trouble.

## COUNT ONE – NEGLIGENCE PER SE

20.   Plaintiffs incorporate paragraphs 1-19 as if fully set forth herein.

21.   Pursuant to O.C.G.A. § 26-2-26 (1), "[a] food shall be deemed adulterated if [i]t bears or contains any poisonous or deleterious substance which may render it injurious to health . . .„ Id. (punctuation omitted).

22.   Pursuant to O.C.G.A. § 26-2-26 (2), "[a] food shall be deemed adulterated if: [i]t bears or contains any added poisonous or added deleterious substance which is unsafe within the meaning of Code Section 26-2-27„[1]. Id. (punctuation omitted).

23.   Pursuant to O.C.G.A. § 26-2-26 (3), "[a] food shall be deemed adulterated if: [i]t consists in whole or in part of a diseased or contaminated, filthy, putrid, or decomposed substance or if it is otherwise unfit for food.„ Id. (punctuation omitted).

24.   Pursuant to O.C.G.A. § 26-2-26 (4), "[a] food shall be deemed adulterated if [i]t has been produced, prepared, packed, or held under unsanitary conditions whereby it may have become contaminated with filth or whereby it may have been rendered diseased, unwholesome, or injurious to health.„ Id. (punctuation omitted).

25.   At the time of her purchase, Ms. Mondragon did not notice anything unusual about either the Bar-S Franks packaging or the hotdogs inside.  The package was not leaking and did not appear to be open.

26.   Approximately three (3) days after purchasing the hotdogs on March 5, 2019, Ms. Mondragon opened the package and prepared two of the hotdogs for herself and her three year old son.

---

[1] Pursuant to O.C.G.A. § 26-2-27, [a]ny poisonous or deleterious substance added to any food, except where such substance is required in the production thereof or cannot be avoided by good manufacturing practice, shall be deemed to be unsafe for purposes of the application of paragraph (2) of Code Section 26-2-26.

4

27. The package of hotdogs contained maggots, which is a deleterious substance which may render them injurious to health as contemplated by O.C.G.A. § 26-2-26 (1).

28. The package of hotdogs contained maggots, which is a deleterious substance which is unsafe within the meaning of Code Section 26-2-27 as contemplated by O.C.G.A. § 26-2-26 (2).

29. The package of hotdogs contained maggots, which is a diseased or contaminated, filthy, putrid, or decomposed substance and is unfit for food as contemplated by O.C.G.A. § 26-2-26 (3).

30. The package of hotdogs contained maggots, which shows that there were "produced, prepared, packed, or held under unsanitary conditions whereby it may have become contaminated with filth,, as contemplated by O.C.G.A. § 26-2-26 (4).

31. Bar S Foods through Kroger sold Ms. Mondragon an adulterated product that sickened her and her three-year old son sick.

32. Bar S Foods through Kroger failed to take precautionary measures to prevent an unsuspecting mother from feeding her son food containing maggots.

**COUNT TWO – STRICT LIABILITY**

33. Plaintiffs incorporate paragraphs 1-32 as if fully set forth herein.

34. Defendants had a duty to warn consumers of any and all reasonable risks of consuming hotdogs including the risk of maggots.

35. Defendants breached their duty by failing to provide adequate warning that the Bar S Foods hotdogs might contain maggots.

36. Defendants' failure to warn was the proximate cause of the Ms. Mondragon and DG's injuries. Had Defendants provided adequate warning on its product, Ms. Mondragon and DG's would not have ingested maggots.

5

37.   Defendants also failed to adequately test and inspect its product before distribution and sale.

38.   The Bar-S Franks were in a defective condition when it left the Defendants' hands

40.   The maggots in the Bar-S Franks made the product unreasonably dangerous, and the maggots was the proximate cause of DG's and Ms. Mondragon's injuries and resultant damages.

**COUNT THREE – BREACH OF WARRANTY OF MERCHANTABILITY (Kroger)**

41.   Plaintiffs incorporate paragraphs 1-40 as if fully set forth herein.

42.   Kroger is a supermarket chain known for selling products, including but limited to meats, fresh produce, household goods, beverages, and canned foods.

43.   As a merchant of such products, when Kroger sold the Bar-S Franks hotdogs product to Ms. Mondragon, it impliedly warranted to her that the product was merchantable and fit for the purpose for which it was intended.

44.   However, the product was defective when Ms. Mondragon purchased it from Kroger.

45.   Ms. Mondragon consumed the Bar-S Franks hotdogs, which is in the ordinary purpose for which it was intended; however, through no fault of her own, the product was defective because it contained maggots.

46.   Ms. Mondragon could not have discovered the maggots before her purchase of the Bar-S Franks hotdogs.

**COUNT FOUR – BREACH OF WARRANTY OF MERCHANTABILITY (Bar S Foods)**

47.   Plaintiffs incorporate paragraphs 1 - 46 as if fully set forth herein.

6

48.  Bar S Foods is a manufacturer of meat products including hot dogs, sausage, lunchmeat, and more.

49.  As a producer of merchant of meat products, Bar-S Franks impliedly warranted to Ms. Mondragon that the hot dogs were merchantable and fit for the purpose for which it was intended.

50.  However, the product was defective when Ms. Mondragon purchased it.

51.  Ms. Mondragon and her son consumed the Bar-S Franks hotdogs, which is in the ordinary purpose for which it was intended; however, through no fault of their own, the product was defective because it contained maggots.

52.  Ms. Mondragon could not have discovered the maggots object before her purchase of the Bar-S Franks hotdogs.

**COUNT FIVE – NEGLIGENCE**

53.  Plaintiffs incorporate paragraphs 1-52 as if fully set forth herein.

54.  Defendants had a duty to produce, distribute, and sell food that is unadulterated and free of maggots.

55.  Defendants breached their duty by producing and selling food to Ms. Mondragon that was not fit for consumption.

56.  Defendants' breach was the proximate cause of the injuries to Ms. Mondragon and DG's.

57.  DG's and Ms. Mondragon's injuries and damages result from Respondent's negligence.

**COUNT SIX – SPECIAL DAMAGES**

58.  Plaintiffs incorporate paragraphs 1-57 as if fully set forth herein.

59.  DG's and Ms. Mondragon's injuries and damages result from Respondent's negligence and wrongful acts.

7

60.   DG's and Ms. Mondragon's has incurred medical bills and health care expenses as a direct and proximate result of the Defendants' wrongful acts.  Plaintiffs sue for recovery of past and future medical expenses which will be further proven at a trial of this case.

**COUNT SEVEN – COMPENSATORY DAMAGES**

61.   Plaintiffs incorporate paragraphs 1-60 as if fully set forth herein.

62.   DG's and Ms. Mondragon's injuries and damages result from Respondent's negligence and wrongful acts.

63.   Plaintiffs have endured pain and suffering after ingesting food containing maggots.

**WHEREFORE,** Plaintiff prays for relief as follows:

(a)  That process issue as provided by law;

(b)  That Plaintiff have a trial by jury;

(c)  That Plaintiff has and recovers a judgment in compensatory and special damages for the pain and suffering endured by him;

(d)  That Plaintiff has and recovers a judgment for his medical expenses; and

(e)  That Plaintiff have such other relief as the Court deems just and proper.

A jury trial is hereby demanded.


Respectfully Submitted this 3rd day of July, 2019.


By:    /s/   Stephen Robinson
Stephen H. Robinson
Georgia Bar No. 101668
Counsel for Plaintiffs

4840 Roswell Road, Building A., Suite 203
Atlanta, GA 30342
(404) 527 – 5157

## IN THE SUPERIOR COURT OF GWINNETT COUNTY
## STATE OF GEORGIA

| | | |
|---|---|---|
| **MAYRA A. MONDRAGON,** | ) | |
| **on her own behalf and on behalf of** | ) | |
| **her minor child, D.G.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **CIVIL ACTION** |
| | ) | **FILE NO.** |
| **v.** | ) | |
| | ) | **19-A-06621-10** |
| **BAR-S FOODS CO., INC.,** | ) | |
| **THE KROGER CO., INC.** | ) | |
| **Defendants.** | ) | |

### VERIFICATION

Personally appeared before the undersigned notary public duly authorized by law to administer oaths, and on his oath swears that the facts contained in the foregoing Complaint are true and correct.

This **3rd** day of _July_ , 2019.

_____
Ms. Mayra A. Mondragon

Sworn to and subscribed
before me this _3rd_ day
of _July_ , 2019.

_____
Notary Public

My Comm Exp:
12/19/21

ARICK COPELAND
NOTARY PUBLIC
FULTON COUNTY, GEORGIA

9

## STANDARD VENDOR AGREEMENT

### VERSION MARCH 2018

This Standard Vendor Agreement (this "**Agreement**") is between The Kroger Co., an Ohio corporation, on behalf of itself and its direct and indirect subsidiaries and other affiliates issuing purchase orders hereunder ("**Kroger**") and the vendor designated on the Signature Page ("**Vendor**") and is effective upon the date of Vendor's signature below.

1. <u>Purchase Orders</u>. This Agreement governs Kroger's purchases of Products from the Vendor. Products means all goods provided to Kroger. Purchase Orders shall not be deemed to waive or modify the terms and conditions contained herein and any modification of this Agreement requires an express, written agreement signed by both parties.

2. <u>Representations, Warranties and Guarantees</u>. The Vendor makes the following representations, warranties and guarantees regarding the Products sold to Kroger:

    a. The Products shipped, as of the date of shipment, comply with, and are not adulterated or misbranded within the meaning of, the Federal Food, Drug and Cosmetic Act, as amended, ("**FDCA**"), including, without limitation, the Food Additives Amendment as further amended and Food Safety Modernization Act ("**FSMA**") and also comply with, and are not adulterated or misbranded within the meaning of, any states' food and drug law; do not violate Section 301 or any other provisions of the FDCA; are not articles that may not be introduced into interstate commerce pursuant to Sections 404, 505 of 512 of the FDCA, the Federal Hazardous Substances Act ("**FHSA**"), or otherwise; if meat, poultry and egg products comply with the Federal Meat Inspection Act, Poultry Products Inspection Act and Egg Product Inspection Act respectively; conform to all applicable Consumer Product Safety Act ("**CPSA**") rules, bans, standards or regulations, and if sold in California, Proposition 65 Standards, and California Air Resources Board 93120 formaldehyde and 94500 et seq. consumer roducts; and furthermore comply with all other applicable federal, state and ocal laws, rules and regulations.

    b. The Products are not produced by endor or other businesses acting under any exemptions pursuant to FSMA, including, but not limited to, exemptions for qualified farms and facilities; Vendor will only utilize other vendors and service providers that comply with FSMA and do not claim exemptions even if they are or might be exempt based on the businesses' size and/or sales within a local marketplace.

    c. Vendor expressly agrees to serve as the Foreign Supplier Verification Program ("**FSVP**") Importer as that term is defined in 21 CFR § 1.500 ("**FSVP Importer**"), identify itself pursuant to 21 CFR § 1.509 as the FSVP Importer in each line entry of Products offered for importation, and perform all other applicable requirements pursuant to 21 CFR Part 1 Subpart L. In all circumstances where both Vendor and Kroger fall within the definition of FSVP Importer, Vendor agrees to serve as the FSVP Importer. This provision shall not apply in circumstances where (i) Kroger is the sole person falling within the definition of FSVP Importer and (ii) Kroger has agreed in writing to be designated on the entry documentation as the FSVP Importer.

    d. Vendor acknowledges Kroger shall reject any load of Products (including Products subject to the Perishable Agricultural Commodities Act) for violations of the Sanitary Food Transportation Act (Section 416 of the FDCA) ("**SFTA**") of which Kroger is aware of, including failure to maintain required records; Vendor assumes responsibility for ensuring loads of Products rejected by Kroger are not sold or distributed unless a qualified individual determines the Products are not unsafe consistent with 21 CFR § 1.908. Vendor must not use

any vehicles or transportation equipment that do not meet sanitary specifications for such food being transported as communicated in writing to shippers, carriers, loaders or receivers as appropriate pursuant to SFTA. Vendor's failure to fulfill the obligations under SFTA under this Section 2(d) will be considered an act or default of Vendor, and a defense to any cargo claim resulting from the condition of vehicles or transportation equipment. None of the provisions in this Agreement in any way limit Vendor's obligation to mitigate its damages. Vendor acknowledges Kroger shall not serve as shipper, carrier or loader as those terms are defined in 21 CFR § 1.904 unless otherwise agreed to in writing.

e.    Each shipment or other delivery of Products is not misbranded or mislabeled under the FHSA or any other law or regulation, has been tested and approved by either the Underwriters Laboratory, Inc. or the ETL, and the National Sanitation Foundation (if applicable); and will include a Certificate of Compliance for children's products or a General Compliancy Certificate for other CPSA regulated products as required under the Consumer Product Safety Improvement Act of 2008 ("**CPSIA**") to the extent applicable. The Products will comply in all material respects with all applicable Federal and State product safety laws and regulations and all applicable and mandatory product safety rules, bans and standards that are enforced by the U.S. Consumer Product Safety Commission, including any failure of a Certificate of Compliance supplied by the Vendor or maintained on Vendor's internet accessible electronic platform to comply with applicable requirements of the CPSIA §14(a); Products will, if constituting or containing an economic poison as defined in the Federal Insecticide, Fungicide, and Rodenticide Act, be registered pursuant to said Act and comply with all other provisions of such Act (7 U.S.C.A. 135-135K); and meet all applicable Occupational Safety and Health Administration Standards. Vendor warrants that all electric appliances, component parts and wiring purchased shall be listed by either the Underwriters Laboratories, Inc. or the ETL in compliance with applicable electrical codes; that all products purchased containing fabric which are subject to the provisions of the Federal Flammable Fabrics Act shall conform to the provisions of such act; that all products purchased which are subject to the provisions of the applicable state bedding and furniture laws shall conform to the provisions of such laws; and that all textile fiber products furnished shall be properly branded and invoiced in accordance with the Textile Fiber Products Identification Act and all other Federal Statutes applicable to such products. Vendor will provide Kroger copies of all Safety Data Sheets ("**SDS**") for any applicable products.

f.    For directly Imported Products, Vendor is in compliance with Kroger's trucking security program which includes, at a minimum, the following criteria for compliance: 1) select trucking and dray carriers that are dependable and willing to participate in security measures, 2) have trained personnel inspect all containers and seals prior to departure, 3) designate a direct route to the port of departure or CFS station, 4) estimate travel time for the trip, 5) monitor actual time to destination, 6) provide a gate in receipt for the trip; and 7) state that the factory understands and is cooperating in this Trucking Security Program. Factory must have a program in place and be able to prove compliance on-site, when asked.

g.    Vendor is in full compliance with all applicable laws, regulations, codes and sanctions relating to anti-bribery and anti-corruption, including but not limited to the US Foreign Corrupt Practices Act, the US Travel Act, the UK Bribery Act 2010, and any and all similar provisions in the jurisdiction(s) in which it operates, that it has not and will not engage in any activity, practice or conduct which would consititute an offense under those requirements, and that it has in place its own policies and procedures adequate to ensure compliance with these anti-bribery and anti-corruption provisions by its officers, employees, agents and any other third party or person associated with Vendor in the performance of services or shipment of Products to Kroger.

h.   The Products, including the packaging, advertising, labels and other materials contained on, with, or relating to the Products, do not infringe any patent, copyright, trademark, trade name or other proprietary interest of Kroger or any third party and comply with the Federal Trade Commission Act and all other applicable laws, rules and regulations.

i.   The price charged, allowances and services furnished, if any, in connection with the sale of Products to Kroger are not discriminatory and were made available on proportionately equal terms to other customers of Vendor.

j.   The Products and the manufacture, sale, storage, shipping, transportation and billing for the Products, comply with all provisions of applicable law and with all applicable promulgations of governmental authority, both domestic and foreign.

k.   Vendor is the lawful owner of the Products, has good right to sell same and convey good and merchantable title, and the Products are and will be conveyed free of any and all claims, liens, security interests or other encumbrances. Vendor represents that unless it has disclosed to Kroger otherwise, it is not a broker or reseller of the Products.

l.   The Products are of merchantable quality and of good material and workmanship, are free from contamination or impurity and defects in design and title, and are fit and sufficient for purposes for which goods of that type are ordinarily used, as well as for any purposes Vendor has specified or advertised.

m.   The Products conform in every respect to applicable specifications, instructions, drawings, data, samples and descriptions to the extent required.

n.   The representations, warranties and guarantees contained in this Section run to Kroger, its customers, and its and their successors and assigns. Vendor incorporates by reference and passes on to Kroger and its customers and its and their successors and assigns the benefits of all warranties and guarantees given to Vendor by persons from whom Vendor purchased any of the Products. Kroger's approval of specifications, drawings, samples and/or other descriptions furnished by Vendor does not relieve Vendor of its obligations. The representations, warranties and guarantees set forth in this Section 2 are in addition to all other express, implied or statutory warranties, are continuing in nature, survive Kroger's payment, acceptance, inspection or failure to inspect the Products.

3.   Code of Conduct. Vendor warrants that the Products and services are produced in compliance with (i) all applicable requirements of the Fair Labor Standards Act, as amended, including Sections 18 and 28 thereof, and of regulations and orders of the United States Department of Labor issued under Section 6 thereof; (ii) the Occupational Safety and Health Act; (iii) all federal civil rights, equal opportunity, discrimination, harassment, retaliation, and other workplace laws, including but not limited to Title VII of the Civil Rights Act of 1964, as amended, the Age Discrimination in Employment Act, as amended, the Americans with Disabilities Act, as amended, and the Family and Medical Leave Act, as amended; (iv) the Immigration Reform and Control Act and other applicable immigration laws; (v) related state and local laws; and (vi) the workers' compensation laws. Vendor represents and warrants that Vendor, its company personnel and its contractors are not engaged in and will not engage in any labor practice in violation of the laws or regulations of the country of manufacture or assembly of the Products including unsanitary and/or unsafe labor conditions. If Kroger determines that Vendor, its company personnel or its contractors have failed to comply with the foregoing, Kroger will be entitled to immediately terminate this Agreement without liability. The Code of Conduct is an Integral part of this Agreement, the terms of which must be followed by Vendor, its Vendor Personnel and its contractors. The Kroger Code of Conduct can be found at https://www.thekrogerco.com/wp-content/uploads/2017/09/code-of-conduct.pdf

Oracle Applications                                                                 Page 4 of 8

4. <u>Country of Origin Requirements</u>. Vendor warrants to Kroger that it complies (or prior to the Effective Date will be in full compliance) with all federal, state and local Country of Origin labeling and related requirements, including those required by the Tariff Act (19 USC Ch. 4) as amended by the Customs Modernization Act, those contained in the Agricultural Marketing Act, as amended by the 2002 Farm Bill, and the implementing regulations (collectively, "Country of Origin Requirements"), and will provide to Kroger all reasonable assistance requested by Kroger and information necessary to enable Kroger to comply with the Country of Origin Requirements as they apply to Vendor's Products. In particular, Vendor will: (a) label or include with all Products subject to the Country of Origin Requirements ("Covered Commodities") that are shipped to Kroger all Country of Origin information that Kroger is required to display or maintain with respect to the Covered Commodities; and (b) comply with all record keeping and product segregation standards required by the Country of Origin Requirements and by Kroger.

5. <u>Indemnification</u>.

   a.    Vendor will defend, indemnify and hold Kroger, its affiliates and its and their officers, directors and employees, harmless from and against all suits, proceedings at law or in equity, claims, liabilities, costs, payments and expenses (including attorneys' fees) asserted against Kroger or incurred by Kroger, arising out of or in connection with 1) the Products, including Kroger's purchase, use, shipment, storage, delivery, sale, offering for sale, or other handling of the Products, 2) Vendor's actual or alleged breach of any of the representations, warranties, guarantees or other terms and conditions contained herein, or 3) any claim for damages to property or injuries to persons or fines or penalties incurred as a result of or caused by the acts or omissions of Vendor's employees or agents.

   b.    In addition to the foregoing, if any of the Products purchased or any part thereof is alleged or held to constitute infringement, Vendor, at its own expense, will either (i) procure for Kroger, its successors, assigns, and customers the right to continue using such Products, (ii) replace the Products with non-infringing items or (iii) only if options (i) and (ii) are impracticable, refund the purchase price for the Products and pay all related expenses. (c) Kroger shall indemnify, defend and hold Vendor harmless from liability resulting from Kroger's breach of this agreement, or any acts or omissions of Kroger or its employees, but only to the extent such liability is not caused by any acts or omissions of Vendor. Vendor will hold harmless Kroger from and against any claims made by any of Vendor's employees, contractors or representatives working in the course and scope of their employment by Vendor or provision of services to Vendor while at any Kroger location and expressly waives any insulation from liability or immunity from suit with respect to injuries to Vendor's employees that may be extended to Vendor under any applicable workers' compensation statute or similar law, unless such claim was the sole and proximate result of the gross negligence and/or willful misconduct of Kroger. Kroger will be held harmless from any workers' compensation liens incurred by such claims. Vendor acknowledges that this provision is a reasonable request from Kroger in order to give Vendor employees, contractors and representatives access to Kroger locations.

6. <u>Insurance Requirements</u>. Vendor will maintain at all times while providing Products to Kroger, at Vendor's own cost and expense, insurance coverage of the types and in such amounts as described in Exhibit A with a company that has an A.M. Best Co. rating of "A-" or better. The insurance coverage required under this Agreement must be Occurrence coverage and maintained by each Vendor for a minimum period of five (5) years following any purchase by Kroger or as long as the Products are still held by Kroger for resale or use, whichever is longer. Alternatively, claims made coverage is acceptable with automatic five (5) year tail coverage. Vendor will deliver to Kroger, prior to shipping Products, a Certificate of Insurance including "The Kroger Co. and its

Oracle Applications                                                                      Page 5 of 8

subsidiaries, affiliates, directors, officers, agents and employees under the Vendors Additional Insured coverage. "

7.   <u>Mandatory Arbitration.</u>

    a.   Any disagreement, dispute, controversy or claim with respect to the validity of this Agreement or arising out of or in relation to this Agreement or a Kroger Purchase Order or any agreement in which either is incorporated, or breach hereof, shall be governed by the substantive laws of the State of Ohio, without regard to conflicts-of-law rules, and shall be finally settled by arbitration in Cincinnati, Hamilton County, Ohio, USA or other location agreed upon by Kroger, in accordance with articles of the American Arbitration Association for Commercial Arbitration, or such other commercial arbitration process as may be mutually agreed upon by the parties. The dispute will be determined by one arbitrator, except that if the dispute involves an amount in excess of $1,000,000 (exclusive of interest and costs), three arbitrators will be appointed. Each party shall bear its own attorney's fees, costs and expenses, and an equal share of the arbitrators' and administrative fees of arbitration.

    b.   Neither party will commence an arbitration proceeding pursuant to this provision unless that party first gives a written notice (a "Dispute Notice") to the other party setting forth the nature of the dispute. The parties agree to try in good faith to settle the dispute 1) first through discussions between the parties' management and then 2) non-binding mediation conducted by a mediator mutually agreeable to the parties before resorting to arbitration. If the parties cannot agree on a mediator within forty-five (45) days of the Dispute Notice, mediation shall be conducted pursuant to the AAA commercial mediation procedures. Failure to submit the Dispute Notice shall be grounds to dismiss any arbitration filed by either party. The parties agree to mediate within sixty 60 days of the Dispute Notice, unless extended by mutual agreement of the parties. The mediation shall be conducted in Cincinnati, Hamilton County, Ohio, USA or other location agreed upon by Kroger. The parties agree to exchange any relevant, non-privileged documents that support their claims or defenses not later than two weeks before the scheduled mediation. The mediator's fees will paid equally by the parties and each party shall bear its own attorney's fees and expenses.

    c.   If the Dispute has not been resolved as provided above, or otherwise resolved, within ninety (90) days after receipt of the Dispute Notice, or any mutually agreed upon extension, then the Dispute will be determined by binding arbitration. All arbitrations will be conducted in accordance with such rules as may be agreed upon by the parties, or failing agreement within thirty (30) days after arbitration is demanded, in accordance with the Commercial Arbitration Rules of the American Arbitration Association ("AAA").

    d.   Discovery will be limited to avoid unnecessary expense and undue burden, but the arbitrators have discretion to determine the extent of discovery that may be allowed consistent with the value of the case, Rule 26 of the Federal Rules of Civil Procedure and AAA Procedures for cost-effective arbitration of Large, Complex Commercial Disputes.

    e.   The arbitrator(s) shall have the authority to grant all appropriate relief available under the Ohio rules of civil procedure and under Ohio law including, but not limited to, sanctions. However, except in a case of gross negligence and/or willful misconduct, neither party shall be entitled to recover any indirect, incidental, special, consequential, exemplary, punitive or reliance damages (including, without limitation, lost or anticipated revenues, lost business opportunities or lost sales or profits, whether or not either party has been advised of the likelihood of such damages) or for any attorney's fees. Any award of damages in excess of three million dollars shall be subject to AAA Appellate Arbitration Rules. Each party shall bear its own attorney's fees, costs and expenses, and an equal share of the arbitrators' and administrative fees of arbitration.

Oracle Applications                                                                                    Page 6 of 8

    f.   Notwithstanding the foregoing, any disagreement, dispute, controversy, claim, or cause of action arising in whole or in part under the antitrust laws of the United States or any State or Territory thereof shall not be arbitrable and is hereby expressly excluded from the scope of this arbitration provision.

    g.   Notwithstanding any contrary provisions in this Section, the parties recognize that certain business relationships could give rise to the need for one or more of the parties to seek emergency, provisional or summary equitable relief to repossess and sell or otherwise dispose of goods, equipment and/or fixtures, to prevent the sale or transfer of goods, equipment and/or fixtures, to protect real or personal property from injury, or to obtain possession of real estate and terminate leasehold interests, and for temporary injunctive relief. Immediately following the issuance of any such relief, the parties agree to the stay of any judicial proceedings pending mediation or arbitration of all underlying claims between the parties.

8.   <u>Confidentiality</u>. Both Kroger and Vendor acknowledge that each party may from time to time possess Confidential Information of the other party. As used herein, "Confidential Information"means all information (whether oral, observed, or written) that is marked or treated as confidential, restricted, or proprietary by the other party, including but not limited to customer information, pricing information, product information, employee information, information regarding business planning and operations, and administrative, financial and marketing activities. Each party will protect Confidential Information of the other party with the same degree of care that it uses in protecting its own confidential information, but not less than reasonable care. Neither party will disclose any Confidential Information to any person except those employees who have a need to know and except as otherwise agreed to in writing by the non-disclosing party. Confidential Information will remain the property of the disclosing party and will only be used for the benefit of the disclosing party. Confidential Information does not include information that the receiving party can prove is: (i) received from a third party having a bona fide right to such information and not under an obligation of confidentiality; (ii) developed independently without reliance on any Confidential Information; (iii) publicly known or readily ascertainable through no wrongful act of the disclosing party, or (iv) required to be disclosed by a court of law, provided the disclosing party notifies the receiving party prior to such disclosure. Both parties will return all Confidential Information contained in a tangible form upon termination of its relationship, or at an earlier time at the other party's request.

9.   <u>Conflict.</u> In the event of any conflict between the terms of this Agreement and any previously executed Standard Vendor Agreement between Vendor and Kroger, the terms of the previously executed Standard Vendor Agreement shall prevail.

## PLEASE FORWARD THIS TO YOUR INSURANCE AGENT OR BROKER
### Vendor Insurance Requirements

**The Kroger Co. and/or Kroger's affiliates and subsidiaries ("Kroger") may require higher insurance coverage limits and/or different coverages for certain product and service providers.**

| Coverage provided by Insurance Carriers rated A- or higher by A.M. Best |
|---|

| The following wording must be included in the Description of Operations box on all Certificates: | Certificate Holder Name and Address: The Kroger Co. and Kroger's affiliates and |
|---|---|

Oracle Applications

| | |
|---|---|
| > "The Kroger Co. and its subsidiaries, affiliates, directors, officers, agents and employees are Additional Insureds with respect to General Liability and Auto Liability"<br><br>> "All insurance policies (excluding Workers' Compensation) are Primary and Non-Contributory to any other insurance owned, secured or in place by The Kroger Co. "<br><br>> A Waiver of Subrogation in favor of The Kroger Co. applies to all coverages (excluding Professional Liability) evidenced on the Certificate of Insurance | subsidiaries<br>C/o The Kroger Co.<br>1014 Vine Street<br>Cincinnati, OH 45202 |

**General Liability**

| | |
|---|---|
| Each Occurrence | $3,000,000 |
| Damage to Rented Premises | $300,000 |
| Products / Completed Operations Aggregate | $3,000,000 |
| Additional Insured Vendors Coverage | CG 20 15 07 04 or its equivalent |
| Personal & Advertising Injury | $1,000,000 |
| General Aggregate | $3,000,000 |

**Auto Liability** (for any supplier whose employees or agents will be driving onto any premise owned or leased by The Kroger Co. or making delivery on behalf of The Kroger Co.)

| | |
|---|---|
| Any Auto | Yes |
| Combined Single Limit - Bodily Injury and Property Damage | $1,000,000 |

**Workers Compensation**

| | |
|---|---|
| Statutory Limits | Yes |

**Employers Liability**

| | |
|---|---|
| Each Accident | $500,000 |
| Disease  Policy Limit | $500,000 |
| Disease  Each Employee | $500,000 |

*Note: a) Required coverage limits can be achieved through a combination of Primary & Excess Liability coverage. Excess coverage must "drop down" for exhausted underlying aggregate limits of liability coverage. b) In certain instances, "Claims Made" policies may be acceptable with automatic tail coverage of 5 years.*

Self-funding or self-insurance of liability, other than workers' compensation and/or automobile liability is allowed, so long as Supplier or Supplier's Parent maintains a net worth of at least $100,000,000.

Please upload your certificate of insurance onto your vendor record within Kroger's Supplier Hub. If you have questions about Kroger's Supplier Hub, please contact Supplier Integrity Team at 1-844-277-6165, option 2.

## ELECTRONIC RECORD AND SIGNATURE DISCLOSURE

**Acknowledging your access and consent to agree to and receive materials electronically**

To confirm to us that you can access this information electronically, please verify that you were able to read this electronic disclosure and that you also were able to print on paper or electronically save this page for your future reference and access or that you were able to e-mail this disclosure and consent to an address where you will be able to print on paper or save it for your future reference and access.

By clicking the box below, you represent and warrant that (i) you are a supplier or acting under the due authorization of a supplier to submit and sign information and agreements on the supplier's behalf; and (ii) any data submitted by you will be accurate and complete.

'I agree' button below.

By checking the 'I Agree' box, I confirm that:

- I can access and read the agreement;

- I am authorized by my company to execute agreements, contracts and other supplier information on behalf of my company; and

- I can print on paper the agreement or save or send the agreement to a place where I can print it, for future reference and access

Last Revision: October 18, 2017

| | | | |
|---|---|---|---|
| | THE KROGER CO. | **Vendor Response:** | I agree |
| | /s/ Michael J. Donnelly | **Name:** | Tony Cracchiolo |
| **Name:** | Michael J. Donnelly | **Organization:** | Bar-S Foods a Sigma Company |
| **Title:** | EVP-COO | **Title:** | Director National Accounts Kroger |
| | | **Signed Date:** | 28-Feb-2019 |